# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Marion HealthCare, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No: _____ |
| | ) |
| Southern Illinois Hospital Services, and | ) |
| Harrisburg Medical Center, Inc., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT
### Antitrust

Plaintiff Marion HealthCare, L.L.C. brings this civil action for injunctive relief under the antitrust laws of the United States to enjoin Southern Illinois Hospital Services from acquiring Harrisburg Medical Center, Inc., an Illinois not-for-profit corporation that is the licensed entity of Harrisburg Medical Center. On information and belief as to Defendants, as well as actual knowledge as to itself and its own acts, Plaintiff respectfully states as follows:

**I.   NATURE OF THE ACTION**

1. SIH is the dominant competitor and a monopolist in a highly concentrated market for acute care general hospital services in southern Illinois. It seeks to acquire Harrisburg Medical Center, one of only two non-SIH acute care general hospitals in the relevant market. In addition to providing acute care general hospital services, both SIH and Harrisburg operate a number of ancillary healthcare service providers, including primary care and specialty care physician clinics.

2. On or about May 25, 2021, SIH and Harrisburg filed an application for change of ownership of a healthcare facility with the Illinois Health Facilities and Services Review Board. (Designated by the Board as application E-012-21). Therein, SIH sought the

1

required Board approval to acquire and incorporate into its existing three-hospital system Harrisburg Medical Center. The result of that merger/acquisition would bring Harrisburg into SIH's system as a fourth hospital, and also bring Harrisburg's affiliated outpatient clinics and physician practices into the SIH system.

3. As described in more detail below, Marion HealthCare opposes this merger. Marion HealthCare alleges that the merger would violate Section 7 of the Clayton Act, Section 2 of the Sherman Act and Sections 3(2) and (3) of the Illinois Antitrust Act (740 ILCS 3), would substantially reduce competition in an already highly concentrated market, would harm the public and would cause antitrust injury to Plaintiff in ways the antitrust laws are designed to prevent.

4. On July 9, 2021, the President of the United States issued an executive order designed to, *inter alia*, address "hospital consolidation [that] has left many areas, particularly rural communities, with inadequate or more expensive healthcare options." The Executive Order affirmed "the policy of [the Biden] Administration to enforce the antitrust laws to combat the excessive concentration of industry, the abuses of market power, and the harmful effects of monopoly and monopsony – especially as these issues arise in labor markets, agricultural markets, Internet platform industries, **healthcare markets** (including insurance, **hospital**, and prescription drug markets), repair markets, and United States markets directly affected by foreign cartel activity." (Emphasis added).

5. In March 2020 the Hamilton Project issued a report authored by Economist Martin Gaynor, PhD of Carnegie Mellon University and a former Director of the Bureau of Economics at the Federal Trade Commission, whose mission is to support antitrust enforcement at the FTC. In the report, entitled "What to Do about Health-Care Markets?

Policies to Make Health-Care Markets Work," Dr. Gaynor notes that there is widespread agreement that the markets of the U.S. healthcare system "do not work," and that "[o]ne of the reasons for this is lack of competition [. . . .].  The research evidence shows that hospitals and doctors who face less competition charge higher prices to private payers, without accompanying gains in efficiency or quality. [. . . ] Moreover, the evidence also shows that lack of competition can cause serious harm to the quality of care received by patients."  The report is just one among the many commentaries, studies and articles on the anticompetitive effects of outsized consolidation in U.S. healthcare markets in recent years, and the focus of increased scrutiny by government antitrust agencies and private plaintiffs alike.

## II.     PARTIES

6. Plaintiff, Marion HealthCare, LLC, ("MHC") is an Illinois limited liability company and the licensed entity of Marion HealthCare Surgery Center. Marion HealthCare Surgery Center is a state-licensed physician-owned freestanding multi-specialty ambulatory surgical treatment center located in Marion, Williamson County, Illinois.

7. Defendant Southern Illinois Healthcare Services is an Illinois not-for-profit corporation that owns and operates two acute care general hospitals, a critical access hospital, outpatient ambulatory surgery centers, and numerous physician practices and primary and specialty care clinics throughout southern Illinois.  Defendant's system includes, *inter alia,* SIH-Memorial Hospital of Carbondale, SIH-Herrin Hospital, SIH-St. Joseph Memorial  Hospital (its three general acute care hospitals, discussed more fully below); and Benton Specialty Clinic, Herrin Specialty Clinic, Pinckneyville Specialty Clinic, SIH Brain and Spine Institute, SIH Breast Center, SIH Cancer Institute, SIH Cardia

Management Center, SIH Center for Medical Arts, SIH Center for Senior Renewal, SIH Center for Wound Healing, SIH-Logan Primary Care, SIH Shirley Ryan Ability Lab, the Orthopedic Institute of Southern Illinois, and Physicians Surgery Center.

8. Defendant Harrisburg Medical Center Incorporated is an Illinois not-for-profit corporation that owns and operates an acute care general hospital in Harrisburg, Saline County, Illinois, as well as several physician practices and primary and specialty clinics in Southern Illinois. In addition to the hospital, the Defendant owns, operates or controls a number of outpatient medical/physician clinics including Eldorado Primary Care, HMC Clinic at Harrisburg, HMC Clinic at Marion, Mach Mine Clinic, Viking Mine Clinic and HMC Outpatient Behavioral Health Clinic.

### III.     JURISDICTION AND VENUE

9. MHC brings this action pursuant to Section 16 of the Clayton Act, as amended, 15 U.S.C. § 26, to prevent the Defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 3(2) and (3) of the Illinois Antitrust Act (740 ILCS 3).  Such violations threaten to substantially lessen competition in the relevant markets and cause significant antitrust injury in the form of losses and damages to MHC.

10. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.

11. Both Defendants maintain principal places of business and transact business in this District.  The anticompetitive acquisition as alleged herein occurred in this District and the anticompetitive effects of the acquisition will be felt in this District.  Consequently, venue is proper in this District under 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## IV.   RELEVANT PRODUCT MARKETS

12. The primary relevant product/service market is the provision of acute care general hospital services. As of the date of this complaint, prior to merger, SIH and Harrisburg are competitors for these services.

13. A second relevant product/service market is the provision of outpatient surgical services. In this market, pre-merger, SIH, Harrisburg and Marion HealthCare are all competitors. SIH and Harrisburg each operate hospital outpatient surgery departments. Both SIH and Marion operate ambulatory surgical centers. As detailed in Marion HealthCare's Third Amended Complaint in *Marion HealthCare, LLC, v. Southern Illinois Healthcare*, pending in the Seventh Circuit Court of Appeals (20-1581), SIH possesses approximately 76% of the market for ambulatory surgery services, whether performed in a hospital outpatient department or ambulatory surgery center, in the relevant 7-County geographic market (as further also defined below).

14. Outpatient surgical services are a broad group of surgical diagnostic and surgical treatment services that do not require an overnight stay in a hospital. Outpatient surgical services are typically performed in a hospital *or* other specialized facility, such as a freestanding ambulatory surgery center that is licensed to perform outpatient surgery. (The term "outpatient surgical services," as commonly understood and as used herein, unless otherwise specified, therefore includes both outpatient surgical services performed in a hospital and outpatient surgical services performed in other specialized facilities, typically freestanding ambulatory surgery centers.) Outpatient surgical services are distinct from procedures routinely performed in a doctor's office. Outpatient surgical services *exclude* inpatient services at hospitals or other facilities that serve solely

children, military personnel or veterans. Although individual outpatient surgical services are not substitutes for each other (*e.g.*, orthopedic and gastroenterological surgical services are not substitutes for one another), the various individual outpatient surgical services can be aggregated for analytic convenience.

15. A closely related secondary market is the provision of primary care and specialty physician services through physician practices and clinics owned and or operated by hospital systems. As noted above, both SIH and Harrisburg own and operate multiple such services. This further secondary market is of vital importance to Marion HealthCare because, as a freestanding ambulatory surgical center, it provides outpatient surgical services to patients who are referred to it by physicians who hold staff privileges at the facility. In many cases, patients initially choose a primary care provider. If a patient requires outpatient surgery, the primary care provider will often make a referral of that patient to a specialty surgeon for evaluation and, if necessary, surgery. That specialty surgeon then will perform surgery at a surgical facility where the physician has been granted surgical privileges.

## V.     RELEVANT GEOGRAPHIC MARKET

16. An appropriate geographic market is "the area in which consumers can practically turn for alternative sources of the product [or service] and in which the antitrust defendants face competition." *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1076 (N.D. Ill. 2012). Defining the geographic market is a "pragmatic undertaking," *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 U.S. Dist. LEXIS 33434, at *149 (N.D. Ohio Mar. 29, 2011) (citation omitted), and it should "correspond to the commercial realities of

the industry," *OSF Healthcare*, 852 F. Supp. 2d at 1076-77.  *See also Republic Tobacco v. North Atlantic Trading*, 381 F.3d 717 (7th Cir. 2004).

17. A relevant test to determine the boundaries of the geographic market is whether a hypothetical monopolist of the relevant services within the geographic area could profitably raise prices by a small but significant amount. "A region forms an appropriate geographic market if this price increase would not be defeated by substitution away from the relevant market or by arbitrage, e.g., customers in the region traveling outside it to purchase the relevant product." Dep't of Justice and Fed. Trade Comm'n, 2010 Merger Guidelines § 4.2.2   This is known as the "hypothetical monopolist" test.

18. Here, the relevant geographic area, using the "hypothetical monopolist test," is a seven-county area consisting of the Illinois counties of Jackson, Williamson, Franklin, Johnson, Perry, Saline, and Union (the "7-County Market").  No acute care general hospitals beyond or even contiguous to this 7-County Market would draw any antitrust cognizable number of patients in response to a small but significant non-transitory increase in price of services by SIH, Heartland or Harrisburg.

19. Jackson and Williamson counties dominate the 7-County Market. These two counties represent over 51.9% of the population of the 7-County Market, 78.5% of all active physicians, 75% of all traditional hospitals, and 100% of Ambulatory Surgical Centers.

20. There are four acute care general hospitals in the market:  SIH-Memorial Hospital of Carbondale in Jackson County, SIH-Herrin Hospital in Williamson County, Heartland Regional Medical Center in Williamson County, and Defendant Harrisburg Medical Center in Saline County.

21. The other six hospitals in the market, including SIH-St. Joseph Memorial Hospital in Jackson County, are not general acute care hospitals but are federally designated critical access hospitals.

22. In the 1980s and 1990s, many rural hospitals closed, leaving many in rural communities without a source of care. To assure access to services, the Centers for Medicare and Medicaid Services (CMS) created a special designation called a Critical Access Hospital (CAH) for rural hospitals that fulfilled certain criteria. Under this designation, CAHs utilize a different reimbursement system than traditional hospitals for Medicare in order to provide these hospitals with greater financial support. CAHs must have 25 or fewer inpatient beds, must be located more than 35 miles from another hospital (though some exceptions apply), must have an emergency room, and have a short length of stay (under 96 hours). The critical assess hospitals in the market do not provide the breadth of services to compete with the four general acute care hospitals in the market and do not compete with the four hospitals in the 7-County Market for the primary product at issue here, namely, acute care general hospital services.

## VI.   BARRIERS TO MARKET ENTRY

23. Since inpatient services can only be provided at a hospital, a potential new hospital must be able to identify and purchase acceptable real estate, have enough capital to construct a hospital, obtain a license, attract sufficient medical, nursing and other clinical staff and non-clinical professional, and must undergo a state Certificate of Need review. Given these high barriers to entry, there have been no new hospitals in the 7-County Market for many years. Additionally, most other hospitals in the 7-County Market cannot expand. To do so, they must also undergo a CON review, but more importantly, with the

exception of Heartland, all other hospitals in the market, are CAHs (Critical Access Hospitals). This designation restricts the number of beds a CAH may have to a maximum of 25 beds. This means entry is unlikely and will not act as a significant deterrent to anticompetitive behavior.

### VII. MARKET CONCENTRATION

24. The Herfindahl-Hirschman Index (HHI) is a common measure of market concentration and is used to determine market competitiveness, often pre- and post-merger, and most notably for proposed acquisition transactions scrutinized by the U.S. Department of Justice and Federal Trade Commission.

25. HHI is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers. It can range from close to zero to 10,000.

26. The closer a market is to a monopoly, the higher the market's concentration (and the lower its competition). If, for example, there were only one firm in an industry, that firm would have 100% market share, and the HHI would equal 10,000, indicating a monopoly. If there were thousands of firms competing, each would have nearly 0% market share, and the HHI would be close to zero, indicating nearly perfect competition.

27. The U.S. Department of Justice and the Federal Trade Commission consider a market with an HHI of less than 1,500 to be a competitive marketplace, an HHI of 1,500 to 2,500 to be a moderately concentrated marketplace, and an HHI of 2,500 or greater to be a highly concentrated marketplace. As a general rule, mergers that increase the HHI by more than 200 points in highly concentrated markets raise antitrust concerns, as they are assumed to enhance market power under section 5.3 of the Horizontal Merger Guidelines jointly issued by the Department of Justice and the Federal Trade Commission.

## VIII. DEFENDANT SIH'S PRE-AND POST-ACQUISITION MARKET POWER

28. As of this date, prior to the proposed merger between SIH and Harrisburg, the relevant geographic market is already highly concentrated under the HHI framework.

29. SIH's 7-County pre-merger market share of inpatient acute care general hospital services is 71.1%. This nets a pre-merger HHI of 5,055, far in excess of the "highly concentrated" threshold.

30. Harrisburg's pre-merger market share is 3.4%, netting an HHI of 113.56.

31. The combined market share post-merger is 74.5%. This provides two important calculations.

32. First, the Harrisburg acquisition would increase SIH's HHI value by 445 points, more than twice the amount that would cause a transaction to be presumed to raise antitrust concerns and assumed to enhance SIH's already considerable market power (and which at this level is understood in case law to constitute monopoly power).

33. Second, the resultant HHI would be 5,500. Recall an HHI of just 2,500 would be considered "highly concentrated." Other than the critical access hospitals that play a different role in the market and do not pose a competitive constraint on acute care general hospitals, the only post-merger competitor standing between SIH and a 100% monopoly would be Heartland's substantially smaller 18.3% market share.

34. Similarly, for the ambulatory surgery services market, the HHI calculation begins with SIH's previously mentioned 76% market share. Squared, this number yields an HHI of 5,776, and a market thus characterized as highly concentrated and presumed to raise antitrust concerns and assumed to enhance market power. On information and belief, Harrisburg's share of the market for ambulatory surgery services would roughly

correspond to its market share for acute care general hospital services, i.e., 3.4%. On this predicate, SIH's resulting share of the ambulatory surgery services market would be 79.4%, which, squared, results in a total HHI of 6,304; this addition of 528 is well more than double the 200 increment that would cause a transaction to be presumed to raised antitrust concerns and assumed to enhance SIH's existing monopoly power in this corollary market.

## IX.   THE ACQUISITION SUBSTANTIALLY REDUCES COMPETITION

35. As detailed in the paragraphs immediately above, the proposed acquisition is presumed under federal antitrust agency guidelines to raise antitrust concerns and thus assumed to enhance SIH's already existing monopoly power in the market for acute care general hospital services. Similarly, the acquisition would enable SIH to maintain and extend its monopoly power in the market for ambulatory surgery services.

36. The effect of the proposed acquisition on the above-mentioned primary and corollary product markets would be to substantially reduce competition in those markets, limiting alternative, competing providers of hospital and ambulatory surgery services, thereby potentially raising costs to patients, reducing choice of institutional providers and physicians, and further, causing antitrust injury to Marion HealthCare.

37. The proposed merger, unless enjoined, would block Heartland from possibly acquiring Harrisburg, and thus enabling it to provide greater competitive constraint and an enhanced alternative source of services. Even assuming Heartland would not seek to acquire Harrisburg, the status quo -- that is, three distinct hospital systems -- is a more competitive landscape than if the proposed merger is allowed, reducing the number of hospital systems to two and increasing SIH's existing monopoly power.

## X.     ANTITRUST INJURY TO PLAINTIFF

38. As noted above, Marion HealthCare provides outpatient surgical services to patients who are referred to it by physicians who hold staff privileges at the facility. In many cases, patients initially choose a primary care provider. If a patient requires outpatient surgery, the primary care provider will often make a referral of that patient to a specialty surgeon for evaluation and, if necessary, surgery. That specialty surgeon then will perform surgery at a surgical facility where the physician has been granted surgical privileges.

39. Marion's medical staff includes physicians who are currently on staff at Harrisburg, who receive referrals from the hospital and from other Harrisburg-affiliated or employed physicians. Other Marion HealthCare Medical staff members not on Harrisburg's medical staff have developed relationships with Harrisburg-affiliated physicians who refer patients to them.

40. The acquisition of Harrisburg by SIH will substantially, if not wholly, curtail those established referral patterns. Patients will instead by referred to SIH-affiliated surgeons who will then perform surgery at SIH facilities, diverting patients who might otherwise seek services from Marion HealthCare and thus resulting in a material loss of income and utilization by Marion HealthCare.

41. Further, SIH's acquisition of Harrisburg would further enhance its ability to attract and retain, on an exclusive basis, surgeons who might otherwise join Marion HealthCare as providers (and possibly owners). In large measure, potential additional surgeons would fall into two camps -- either SIH-affiliated or non-SIH-affiliated. Those employed by or affiliated with SIH would not be candidates for affiliation with Marion HealthCare. Non-SIH-affiliated physicians would generally be affiliated with Harrisburg and/or Heartland

Regional Medical center. These physicians would be candidates for affiliation with Marion HealthCare. The merger removes Harrisburg-affiliated physicians from the candidate pool and thus greatly reduces opportunities to provide ambulatory surgery services for any physicians not employed by or affiliated with SIH's system. A reduction in the ability to attract new physicians and/or replace departing or retiring physicians has a substantial negative effect on Marion HealthCare's income and utilization and by extension, the availability, timeliness and efficiency of services to its patients.

42. Additionally, Marion HealthCare is an employer and provides employee group health insurance for its employees through a plan purchased from BlueCross BlueShield. Expanding SIH's market power further enables it charge higher prices to insurers such as BlueCross, with which SIH has an exclusive provider contract. This in turn results in higher health premiums charged by BlueCross to its insureds, as well as higher copays and patient-responsibility balances borne by Marion HealthCare and its employees.

## XI.     COUNT I: Clayton Act §7 Violation

43. Plaintiff incorporates its allegations from paragraphs 1-42 above as if fully stated herein.

44. As a result of the merger, SIH is able to further exercise its market power in the relevant market. This market is already highly concentrated and the combination significantly increases that market concentration, to the detriment of the public and Plaintiff.

45.  It is highly unlikely that entry into the market would remedy the anticompetitive effects from the merger because of the market barriers and economic realities described above.

46. The effect of the merger substantially lessens competition in the provision of healthcare services in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C.§ 18, in the following ways:

   a. eliminating actual, direct, and substantial competition between SIH and Harrisburg in the relevant product market and relevant geographic market for the provision of healthcare services;

   b. increasing the ability of the merged entity to unilaterally raise prices of healthcare services;

   c. reducing incentives to improve service quality in the relevant markets; and

   d. enabling SIH to further consolidate and expand its power over ambulatory surgery services, reducing competition in this market, causing additional antitrust injury to the public and to Marion HealthCare.

## XII.   COUNT II: Sherman Act § 2 Unlawful Monopolization

47. Plaintiff incorporates its allegations from paragraphs 1-42 above as if fully stated herein.

48. Prior to the acquisition of Harrisburg, SIH already held a monopoly in acute care general hospital services in the relevant geographic market.

49. With the acquisition of Harrisburg, SIH has taken action to maintain and extend its monopoly power.

50. As a result of SIH's market power, prices in the healthcare services market have been higher than they would have been in a competitive market; the supply of services in that market has been lower than it would have been in a competitive market; and the number and effectiveness of competitors has been maintained at a lower level than would have obtained in a competitive market. The acquisition of Harrisburg extends and enhances SIH's monopoly power and the anticompetitive effect it has on the market.

51. SIH's conduct constitutes unlawful monopolization and the unlawful use of anticompetitive conduct in the relevant market in violation of Section 2 of the Sherman

Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

52. As a direct and proximate result of SIH's conduct, Plaintiff and the public at large will be injured and financially damaged in amounts yet to be determined.

## XIII.  PRAYER FOR RELIEF

Wherefore, Plaintiff, Marion HealthCare, requests the following relief:

a. The Court adjudge and decree that the merger/acquisition of Harrisburg by SIH violates Section 7 of the Clayton Act and Section 3(2) of the Illinois Antitrust Act (740 ILCS 3(2)) as a merger or acquisitions where the effect may be substantially to lessen competition, or to tend to create a monopoly.

b. The Court adjudge and degree that the merger/acquisition by SIH violates Section 2 of the Sherman Act and Section 3(3) of the Illinois Antitrust Act (740 ILCS 3(3)) by reason of its maintenance and extension of its monopoly power in the primary market for acute care general hospital services and extension of its market power in the corollary market of ambulatory surgery services.

c. Equitable relief in the form of a Temporary Restraining Order and Preliminary Injunction barring Defendants from taking action in furtherance of or consummation of the merger/acquisition of Harrisburg by SIH while the action is pending.

d. A permanent injunction requiring any action previously taken in furtherance of or consummation of the merger/acquisition of Harrisburg by SIH to be reversed and nullified.

e. The Court orders the divestiture by SIH of Harrisburg and associated assets, in a manner that restores Harrisburg as a viable, independent competitor in the relevant market.

f. The Court grant any other relief appropriate to correct or remedy the anticompetitive effects of SIH's acquisition of Harrisburg or to restore Harrisburg as a viable, independent competitor in the relevant market.

g. The Court issue an order barring any future merger or acquisition between SIH and Harrisburg, in violation of Section 7 of the Clayton Act, Section 2 of the Sherman Act or any other laws addressing competition of the United States or the State of Illinois.

h. Such other and further relief as this Court may deem proper.

Respectfully submitted this 29th day of July, 2021,

> s/THOMAS J. PLIURA
> Thomas J. Pliura,
> Attorney for Plaintiff/Lead Counsel
> Law Offices of Thomas J. Pliura, M.D., J.D.
> P.O. Box 130
> LeRoy, IL 61752
> Telephone: (309)962-2299
> Fax: (309)962-4646
> Email: tom.pliura@zchart.com
>
> Richard Wolfram, Esq. (to be admitted *pro hac vice*)
> 747 Third Avenue, 2nd Fl.
> New York, New York 10017
> Tel:  917-225-3950
> rwolfram@rwolframlex.com
>
> *Counsel for Plaintiff*